In re Martha SUDLER, Debtor.

Martha SUDLER, Plaintiff,

v.

CHESTER HOUSING AUTHORITY, Defendant.

Bankruptcy No. 86–05219S.
Adv. No. 86–1342S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 30, 1987.

Jeffrey M. Edelson, Michael Donahue, Chester, Pa., for debtor.

Ronald David Ashby, Media, Pa., for Chester Housing Authority.

Joseph B. Finley, Jr., Philadelphia, Pa., trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The issues presently before us in these inter-related matters require us to make a very fine determination of a public housing tenant's interest in a continuing tenancy in her public housing unit when her eviction was but a small step away from consummation prior to her bankruptcy filing. However, because the housing authority seeking her eviction did not make this last small step, we hold that the tenant's lease was not terminated at the time of her bankruptcy filing. Thus, the tenant is not only entitled to an injunction preventing her eviction, but also she is entitled to withstand a motion by the public housing authority seeking to obtain relief from the automatic stay on a record upon which relief could be granted only if we deemed

the lease to have been terminated at the time of her bankruptcy filing.

The Debtor, MARTHA SUDLER, filed this Chapter 7 bankruptcy case at 9:13 A.M. on November 12, 1986. At 9:07 A.M. on the very next day, November 13, 1986, she filed the adversarial proceeding also before us, naming as Defendant the CHESTER HOUSING AUTHORITY (hereinafter referred to as "the CHA"). AT the time of the filing of the Complaint in the adversarial proceeding, the Debtor filed a Motion for a Temporary Restraining Order (hereinafter referred to as a "TRO") to prevent the CHA from interfering with her continued quiet possession of her public housing unit, contending that the CHA, her landlord, was attempting to lock her out of her unit in violation of the automatic stay, and we granted same.

A hearing on the Debtor's Motion for a Preliminary Injunction requesting the same relief as the TRO on a more permanent basis was originally scheduled on November 18, 1986. However, the parties agreed that the CHA would honor the TRO until the date of a continued hearing, and we ultimately scheduled the hearing on the afternoon of the Friday after Thanksgiving, November 28, 1986.

At the close of the hearing, we immediately announced our intention to grant the Preliminary Injunction, and this was memorialized by an Order of December 1, 1986. However, we made it clear to the Debtor at that time that our decision was based solely upon our finding that she retained a possessory interest in the premises as of the date and time of her bankruptcy filing which was protected by the automatic stay effected by her bankruptcy filing. *See* 11 U.S.C. §§ 362(a)(2) and (a)(3). Consequently, we cautioned her that her right to continued possession might well end upon the CHA's successful filing of a Motion to obtain relief from the stay, per 11 U.S.C. § 362(d), in her bankruptcy case.

Taking this cue, the CHA filed a Motion for Relief from the Automatic Stay in the Debtor's main bankruptcy case on December 12, 1986. In this Motion, the CHA alleged that the Debtors' lease terminated when she "was legally evicted and ordered by the District Court for the City of Chester to vacate the premises" and that the Debtor was not paying post-petition rent and continuing to occupy the premises. The Debtor filed an Answer denying all of the significant allegations in CHA's Motion, and asserted several affirmative defenses, most notably a claim that the CHA's Motion constituted unlawful discrimination against her by a governmental unit because of her bankruptcy filing, in violation of 11 U.S.C. § 525.

The hearing on this Motion was originally scheduled on January 8, 1987. The final hearing in the adversarial proceeding was originally scheduled on January 20, 1987. The parties mutually agreed to continue the hearings in both matters until February 4, 1987.

On the latter date, the parties' respective counsel appeared and advised us that they wished to have the Court decide both matters on the basis of the record made at the Preliminary Injunction hearing in the adversarial case conducted on November 28, 1986. The Court orally requested, in a directive memoralized by an Order of February 6, 1987, that the parties simultaneously submit Briefs in support of their respective positions on or before February 25, 1987. Ultimately, the parties mutually requested an extension until March 4, 1987, to submit their respective Briefs. They filed these, and the Debtor additionally filed a one-page Reply Memorandum on March 12, 1987.

We believe this to be a close case, turning upon application of finely-worded state law upon a confusing state of facts. It is necessary for us to focus especially intently upon what occurred between the Debtor and the manager of the CHA project in which she resided, John Walker, on November 6, 1986. We therefore carefully reviewed our own voluminous notes made at the trial and listened to the tape recordings of a significant portion of the hearings, particularly the testimony and cross-examination of the Debtor, her now 17–year–old daughter Sonya, and Mr. Walker. From

the foregoing, we make the following Findings of Fact.

## B. FINDINGS OF FACT

1. The Debtor is a very low income woman who is the single-parent head of a family including her daughters, Yolanda and La-Vonnia, who were aged nine and six years at the time of the hearing. A teen-aged daughter, Sonya, born March 26, 1970, and hence who has just turned seventeen years, resided intermittently with the Debtor and at other times with other relatives during 1986.

2. Since 1984, the Debtor has resided at 402 C Ayers Place, which is a unit in the crime-ridden William Penn "Community" or Housing Project, owned and operated by the CHA.

3. The Debtor's only source of income is public assistance. At the hearing, she testified that her total income was $365.00 monthly welfare benefits.

4. As a public housing authority, the CHA is obliged to adjust its tenants' rents according to their income, pursuant to certain guidelines promulgated by the United States Department of Housing and Urban Development (hereinafer referred to as "HUD"), which subsidizes such projects. *See* 24 C.F.R., Part 913. The monthly rent of the Debtor for her unit, as of the hearing date, was established at $86.00 monthly.

5. We take judicial notice of the fact that, as a condition for receipt of its subsidies, HUD has imposed certain requirements upon public housing authorities in procedures utilized for termination of the tenancies of its residents. *See* 24 C.F.F. § 966.4(*l*). Among these are requirements that such authorities may terminate such tenancies only for certain "good cause" and that public housing authorities must strictly. adhere to all applicable state and local laws in evicting tenants whose tenancies they seek to terminate. *Id.*

6. The Debtor became delinquent in her rental payments, apparently some time in late 1985. Consequently, the CHA commenced a landlord-tenant proceeding against her in the local District Justice of the Peace Court, obtaining a judgment against the Debtor for possession and back rent in the amount of $870.01 on May 2, 1986, solely because she failed to pay her required rent.

7. On August 25, 1986, the Debtor was served with an Order for Possession, pursuant to Pennsylvania Rule of Conduct, Office Standards and Civil Procedure for District Justices (hereinafter referred to as "Pa.R.C.P.D.J.") 517.

8. The Debtor testified that she made some efforts to locate alternative housing, and we take judicial notice of the fact that no comparable housing renting at $86.00 monthly, or any sum proximate thereto, is available in the City of Chester, or in any other situs accessible to the Debtor.

9. On Wednesday, November 5, 1986, Mr. Walker came to the Debtor's unit and advised her that she would be forcibly evicted, pursuant to the Order for Possession, on the following morning.

10. Accordingly, on the morning of Thursday, November 6, 1986, Mr. Walker, a constable from the District Justice of the Peace Court, and several employees of a moving and storage company, Arcade Storage Co., appeared with a truck, and the latter parties began removing the Debtor's personal property from her unit.

11. Of the parties assembled at the eviction scene, Mr. Walker left first. Then the constable left. While the Debtor and her family alone remained on the scene with the Arcade employees, the latter loaded all but the Debtor's food, clothings, and small wall ornaments onto their truck. However, no further actions were taken, physically or symbolically, by either Mr. Walker or the constable or the Arcade Storage employees, to actually compel the Debtor and her family to leave the premises on November 6, 1986. Therefore, after all of the assemblage of persons cited herein left, having no other place to go, the Debtor and her family remained in the premises, sleeping on pads and at some point bringing a television into the unit.

12. Due to the high-crime environment of the William Penn Project, the Debtor, like many other residents, had installed her own lock on her unit's door. No effort was made by any of the parties assembled at the unit on November 6, 1986, to remove the lock placed on the door by the Debtor, or to install any other lock on the premises to prevent the entry into the premises by the Debtor and her family.

13. The Debtor and her daughter Sonya both testified that, on Monday, November 10, 1986, Mr. Walker came to their unit and informed them that they would be locked out if they did not remove themselves by Wednesday, November 12, 1986, further advising that no action would be taken on Tuesday, November 11, 1986, because the CHA offices were closed that day in observation of Veterans Day.

14. Mr. Walker, on direct examination, testified that he did not speak to the Debtor or her daughter at all on November 10, 1986. However, on cross-examination, he did admit, in a statement which appeared implicitly inconsistent with his direct testimony, that he had received a complaint from another CHA tenant that the Debtor and her family were still occupying the unit after their purported eviction, and that he had investigated the complaint that day without confronting the Debtor.

15. We credit the testimony of the Debtor and her daughter. We do not see how Mr. Walker would have failed to confront the Debtor if he had investigated this complaint. We also found the Debtor and her daughter to be totally spontaneous witnesses, while we found Mr. Walker more guarded, and apparently under pressure from his employer to cast its position in the best possible light. Finally, we believe that Mr. Walker is a compassionate individual, who would probably (and we believe, from a moral standpoint, perhaps rightly) take it upon himself to grant an unauthorized, brief time dispensation to a family which included small children and which was otherwise going to be rendered homeless.

16. Mr. Walker and another CHA employee did appear again at the Debtor's unit at approximately 3:30 P.M. on Wednesday, November 12, 1986, and at that time did remove the lock installed by the Debtor and replaced it with another lock to purportedly lock the Debtor out of her premises. However, by this time, the Debtor had already filed her bankruptcy.

## C. CONCLUSIONS OF LAW

■ 1. The Debtor's possessory interest in her unit, as of the time that her bankruptcy was filed, was property of her estate which was protected by the automatic stay imposed by her bankruptcy per 11 U.S.C. §§ 362(a)(2) and (a)(3).

■ 2. Irrespective of whether the tenancy of the Debtor had been terminated as of the time of her bankruptcy filing, the automatic stay was in place and prevented any legal efforts by the CHA to evict her unless and until it received relief from the automatic stay.

3. Our Preliminary Injunction Order of December 1, 1986, was therefore clearly properly entered.

4. The CHA, in its Motion for relief from the automatic stay, per 11 U.S.C. § 362(d), failed to make a record to support any basis for relief under that Code section other than a contention that the Debtor's lease had been terminated prior to the filing of the bankruptcy case.

■ 5. Under the controlling Pennsylvania state landlord/tenant law, the Debtor's tenancy could not be terminated unless and until "actual delivery of the real property" was made to the CHA. Pa.R.C.P. D.J. 518.

6. Since the Debtor and her family were neither physically nor symbolically completely put out of their premises as of the time of their bankruptcy filing, the Debtor's tenancy had not been terminated prior to the filing of the bankruptcy case.

7. The CHA is therefore not entitled to relief from the automatic stay on the basis of the record made on this Motion at this juncture, and therefore the Motion must be denied at this time.

8. The Debtor is entitled to an Order granting her final injunctive relief in the adversarial case.

## D. DISCUSSION

As we previously indicated, we consider this to be a difficult and close case. Confronting the Debtor is the following extremely well-established principle noted by us in *In re Mason, Mason v. Benjamin Banneker Plaza, Inc.,* 69 B.R. 876, 881 (Bankr.E.D.Pa., 1987):

> a tenancy interest which has been terminated prior to the bankruptcy filing cannot be revived by the bankruptcy filing. *See e.g., In re Best Film & Video Corp.,* 46 B.R. 861, 869–70 (Bankr.E.D.N.Y. 1985); *In re Heaven Sent, Ltd.,* 37 B.R. 597, 598 (Bankr.E.D.Pa.1984) (per GOLDHABER, CH. J.); and *In re Anne Cara Oil Co.,* 32 B.R. 643, 647–48 (Bankr.D. Mass.1983).

*See also, e.g., In re Triangle Laboratories, Inc.,* 663 F.2d 463, 467–68 (3d Cir.1981); *In re Escondido West Travelodge,* 52 B.R. 376, 378 (S.D.Cal.1985); *In re Borbridge & DeSantis,* 66 B.R. 998, 1003 (Bankr.E.D.Pa. 1986); *In re Cohoes Industrial Terminal, Inc.,* 62 B.R. 369, 377 (Bankr.S.D.N.Y. 1986); and *In re DePoy,* 29 B.R. 466, 471 (Bankr.N.D.Ind.1983).

However, this is the beginning rather than the end of our inquiry. For it is also well-established that the determination of whether a tenancy interest has been terminated prior to the bankruptcy filing requires the application of the law of the particular jurisdiction where the tenancy is situated to the facts at hand. *See In re Goodloe,* 61 B.R. 1016, 1019 (Bankr.M.D. Tenn.1986); *In re Shannon,* 54 B.R. 219, 220 (Bankr.M.D.Tenn.1985); *In re Morales,* 45 B.R. 314, 316–17 (Bankr.E.D.Pa.1985), *aff'd,* C.A. No. 85–1159 (E.D.Pa., Bench Opinion issued April 25, 1985); and *Executive Square Office Bldg. v. O'Connor & Associates, Ltd.,* 19 B.R. 143, 146–48 (Bankr.N.D.Fla.1981). As the *Executive Square* court states:

> As long as an asserted or alleged lease termination is still subject to an anti-forfeiture (i.e., anti-termination) proviso of a state statute, ... then, until such time as such anti-forfeiture or anti-termination hurdles are cleared it may be imprecise to say that there has been a forfeiture or termination; ... *Id.* at 146.

The law of Pennsylvania pertinent to residential leases, unlike that of the jurisdictions from which the CHA cites cases in support of its position, i.e., California, New York, and Indiana, *does* contain an "anti-forfeiture" or "anti-termination" provision, *i.e.,* PA.R.C.P.D.J. 518, which provides as follows:

> Rule 518. Satisfaction of Order by Payment of Rent and Costs
>
> At any time before actual delivery of the real property is made in execution of the order for possession, the defendant may, in a case for the recovery of possession solely because of failure to pay rent, satisfy the order for possession by paying to the executing officer the rent actually in arrears and the costs of the proceedings. The executing officer shall give the defendant a signed receipt for any such payment.

We also would point out that the above District Justice rule is not any sort of aberration in Pennsylvania law. Rather, this rule of landlord-tenant procedure flows naturally from the Pennsylvania caselaw which has termed forfeitures as "odious," *Arcon Development Corp. v. United States,* 409 F.Supp. 671, 673 (W.D.Pa.1976); "disfavored," *Barraclough v. Atlantic Refining Co.,* 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974); and "abhorrent," *In re Kam Dam Marina, Inc.,* 20 B.R. 414, 416 (Bankr.W.D.Pa.1982); and *Jackson v. Richards 5 & 10, Inc.,* 289 Pa.Super. 445, 452, 433 A.2d 888, 892 (1981).

The District Justice rule in issue, enacted in 1982, had a longstanding immediate predecessor in a now-repealed provision of the Pennsylvania Landlord and Tenant Act of 1951, former 68 P.S. § 250.504 (last paragraph). As our brother, Judge Fox, accurately observed in *Borbridge & DeSantis, supra,* 66 B.R. at 1003 n. 11, the Pennsylvania common law would recognize such a "right to cure," even if there had

been no specific re-enactment of § 250.504 in Pa.R.C.P.D.J. 518.[1]

■■■ We would also be remiss if we failed to observe that the Debtor's status as a tenant of a public housing authority enhances her rights. Such cases as *Noble v. Bethlehem Housing Authority*, 617 F.Supp. 248, 250–52 (E.D.Pa.1985); *Staten v. Housing Authority of Pittsburgh*, 469 F.Supp. 1013, 1015 (W.D.Pa.1979); and *McMichael v. Chester Housing Authority*, 325 F.Supp. 147, 148–49 (E.D.Pa.1971), have established that tenants of such federally-subsidized housing have an additional layer of protection arising from the Due Process Clause of the Constitution. The governmental agency which owns a public-housing premises must adhere strictly to both federal Regulations *and* to pertinent state law before it can succeed in terminating the rights of such tenants, or issues of constitutional dimension arise. The combination of federal procedural requirements superimposed on state substantive law can be a powerful combination at the disposal of a public housing tenant who seeks to resist a claim that a lease has terminated. *See Goodloe, supra,* 61 B.R. at 1019.

In the bankruptcy context, yet another layer of protection for tenants of federally-subsidized housing arises from 11 U.S.C. § 525(a) which provides as follows:

Sec. 525. Protection against discriminatory treatment.

(a) Except as provided in the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. Secs. 449a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. Secs. 181–229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. Sec. 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

*See generally In re Metro Transportation Co.,* 64 B.R. 968, 975–76 (Bankr.E.D.Pa. 1986).

■■■ This provision prevents a public housing authority from denying a future public housing tenancy to a debtor-tenant on the basis of a prior rent obligation which has been discharged in bankruptcy. *See In re Amhurst,* Bankr. No. 84–02064T (Bankr. E.D.Pa., Order of March 8, 1985) (Order of Chief Judge Twardowski of this Court expressly adopting "the reasoning and holding" of *Gibbs, infra);* and *In re Gibbs,* 9 B.R. 758, 763–64 (Bankr.D.Conn.1981),

---

1. We also note that the Pennsylvania legislature has accorded mortgagors, as well as tenants, a liberal "right to cure." *See* 41 P.S. § 404. *See generally In re Schwartz,* 68 B.R. 376, 377–79 (Bankr.E.D.Pa.1986).

We originally surmised that the Debtor here might be in the category of tenants clinging to only a naked possessory interest at the time of filing. When we announced our decision on November 28, 1986, which we incorporated into our Order of December 1, 1986, we believed that our decision was correct, whether the Debtor's tenancy had terminated or not, on the basis of the foregoing reasoning. It was there-

fore not necessary to reach the issue of whether the Debtor's tenancy had terminated in making that decision. We felt it appropriate at that time to warn the Debtor that, if we found that her tenancy had been terminated, a Motion to remove the stay would almost *ipso facto* result in the end of her right to retain possession. If we had found that the tenancy had terminated, which we agree is a close question, then we would have granted the relief sought here by the CHA at this time. However, today being compelled to reach the issue as to whether the tenancy was terminated, we are obliged to conclude that it was not.

*reaff'd*, 12 B.R. 737 (Bankr.D.Conn. 1981). We believe that the strong public policy of 11 U.S.C. § 525 overrides the potential requirement of 11 U.S.C. § 365(b)(1) that a debtor assuming a lease must cure any pre-petition defaults or otherwise provide adequate protection to the landlord. *See also In re Adams*, 65 B.R. 646, 648 (Bankr.E.D.Pa.1986); and *In re Knight*, 8 B.R. 925, 928–29 (Bankr.D.Md. 1981) (A trustee's rejection of a lease, per § 365(d)(1), may merely constitute an abandonment to the tenant rather than effect a termination of the lease.)

■ Finally, another layer of protection to a public housing tenant arises from the pertinent federal Regulations. Not only a public housing authority, see 24 C.F.R. §§ 966.4($l$)(1), (f), but also a private landlord renting a federally subsidized unit, see 24 C.F.R. §§ 247.3, 880.607, 881.607, 882.-511, 883.708, 884.216, and 886.328, must establish "good cause" before the termination of a lease can occur. If the landlord's only basis for a claim of termination of a lease is that the Debtor owes pre-petition rent, this basis may not constitute the requisite "good cause," especially in light of the "fresh start" principle of *Local Loan Co. v. Hunt*, 292 U.S. 234, 244–45, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934).

It is in this context of the existence of numerous layers of protection encompassing the Debtor that we must analyze Pa.R. C.P.D.J. 518 and apply it to the instant factual matrix. The Rule establishes an "anti-forfeiture" or "anti-termination" feature, and then further provides that, at least in a case where, like here, the lease is terminated solely because of the tenant's non-payment of rent, the "right to cure" continues until the moment that "actual delivery of the real property occurs." We believe that the words "actual delivery" are legally significant, and preclude the termination of the "right to cure," and hence the termination of a tenancy, at any moment prior to the time that the constable physically puts the tenant completely out of the property. This is especially so when we consider that the word "actual" is used. This appears to preclude a finding that even a symbolic delivery, i.e., taking the tenant's keys or locking a tenant out where re-entry is a distinct possibility, would suffice to constitute a consummation of the eviction process.

In the instant factual matrix, we find that the moment of "actual delivery" never arrived on November 6, 1986. It is undisputed that the constable (and Mr. Walker) departed before the employees of Arcade Storage Co. finished taking the property of the Debtor out of the premises. It is also undisputed that the Arcade Storage employees never did finish this engagement, and that the Debtor and certain of her property remained in the premises at all times. No attempt at even a symbolic delivery, by making some adjustment to the locks, was attempted by any of the parties present at the eviction scene.

■ No other attempt to effect an "actual delivery" was made until the afternoon of November 12, 1986, when Mr. Walker returned to attempt to lock the Debtor and her family out. This act was, of course, subsequent to the bankruptcy filing, and was hence "totally and completely void" in legal significance. *In re Clark*, 69 B.R. 885, 890 (Bankr.E.D.Pa., 1987). It is not clear that this act would have had any legal effect in any event, because it was not done by the executing officer, the constable.[2]

---

**2.** There is pertinent Pennsylvania law which establishes that, even when a tenant who is totally legally evicted from a premises re-enters, the landlord seeking to re-evict the tenant must resort to at least a summary new legal process, and obtain a new writ of possession, after remitting a praecipe and affidavit. *See* Pennsylvania Rule of Civil Procedure 3165; *Allison v. Couperthwait*, 5 SOMERSET L.J. 315 (1931); and 9 GOODRICH–AMRAM 2d, § 3165.3, at 643 (1977). Such legal process can clearly be effected only by a court officer, in this case the constable, especially since Pennsylvania law does not sanction a landlord's self-help remedies. *See Adams, supra*, 65 B.R. at 649.

It is true that, if a tenant re-entered a premises after a legal eviction had been consummated, as per Pa.R.C.A.D.J. 518, he could not reawaken a tenancy which at that point would have been terminated. In such a case, while the automatic stay would be in place to temporarily protect the tenant's naked possessory interest, the landlord would be readily able to obtain relief from

This analysis also renders it rather insignificant whether Mr. Walker had an exchange with the Debtor on November 10, 1986, or not, which was the only credibility issue that we resolved in our factual findings. It is likewise insignificant what Mr. Walker did or said on November 12, 1986. What alone is significant is that the constable did not make an actual delivery of the premises on November 6, 1986, nor at any time thereafter, as it is undisputed that the constable never returned to the premises after November 6, 1986.

■ We should further observe that we do not believe that this decision turns on simply an insignificant legal technicality, in light of our holding that the decisive factor is that the constable did not effect an "actual delivery" of the premises on November 6, 1986. In addition to all of the Pennsylvania caselaw revealing the discomfiture of the law of this state with forfeitures, we must consider here the rights of the Debtor qua debtor in bankruptcy and qua tenant in public housing. When this bundle of circumstances is considered, it becomes quite apparent that we must read the law strictly in favor of the Debtor-tenant. Hence, any failure to conform to Pennsylvania law is quite significant and must be fatal to the CHA's arguments that the Debtor's tenancy was terminated pre-petition.

Perhaps the best example of reasoning analogous to that engaged in by us here was employed by Chief Judge Twardowski of this Court, in a decision affirmed in a Bench Opinion of District Judge VanArtsdalen on the date of argument, in *Morales, supra*. There, the Debtor, a public housing tenant, was actually physically evicted by a constable in the manner contemplated by Pa.R.C.P.D.J. 518. However, as it developed, the constable had performed the eviction at 4:00 P.M. on the 15th day after the service of the Order for Possession, which had occurred at 6:15. 45 B.R. at 315. Holding that Pa.R.C.P.D.J. 519 required that fifteen full or clear days must pass between the service of the Order for Pos-

session and its execution, and hence that the constable had acted about two (2) hours too soon, the bankruptcy court and the district court, without the benefit of any Pennsylvania cases construing Pa.R.C.P. D.J. 519 as they did, ruled that the execution was premature and hence a nullity. Hence, the facts here, which involve a more substantial breach of the pertinent Pennsylvania landlord/tenant procedure than did those in *Morales*, must result in a decision, like that in *Morales*, in favor of the debtor-tenant.

■ We must therefore reject the argument of the CHA that, under Pennsylvania law, the tenancy of the Debtor could be held to have terminated at either the date of mailing a termination notice to the Debtor, or the date that a judgment for possession was entered, or the date that an Order for Possession was entered, or even on November 6, 1986, even though the Debtor herself may have thought that, after the event of that date, her lease *had* terminated and that she had no right to remain in the unit, as she candidly testified. Putting aside the fact that her actions in remaining in the unit speak louder than her words, it is clear to us that we cannot follow a party's interpretation of the law, as opposed to our own, even when our interpretation is more generous to the party than his or her own interpretation might have been. This is particularly true when the party is a person as totally unschooled in the law as this Debtor obviously was. We cannot expect her to divine that she had rights which even learned counsel for the CHA has vigorously argued that she did not have. Hence, her "admissions" that her tenancy had in fact been terminated on November 6, 1986, must therefore be accorded no weight by us.

As we specifically found above, the CHA has presented no record to support a basis for granting relief on any grounds other than its contention that the lease had terminated pre-petition. We recognize that the

the automatic stay. *See, e.g., Borbridge & De-* *Santis, supra,* 66 B.R. at 1002.

CHA has alleged that the Debtor has not paid post-petition rents. We believe that, if this fact can be established, the CHA most probably could successfully invoke 11 U.S.C. § 362(d) to obtain relief on the ground that its interests are not adequately protected. *See, e.g., In re Grant Broadcasting of Philadelphia, Inc. (Fourth Opinion)*, 71 B.R. 891, 901–02 (Bankr. E.D.Pa.1987); *Borbridge & DeSantis, supra*, 66 B.R. at 1003–05; *In re Dabney*, 45 B.R. 312, 313–14 (Bankr.E.D.Pa.1985); and *In re Law Clinic of Mott & Gray*, 39 B.R. 73, 74–75 (Bankr.E.D.Pa.1984).

However, here, the CHA has made no record of post-petition rental defaults. The Debtor has denied all allegations of non-payment included in the CHA's Motion. The testimony which constitutes the record, made at the hearing on November 28, 1986, was necessarily insufficient to establish this fact, as it was conducted prior to the date that any post-petition rent would have been due.

We have twice written to point out that the Moving Party in a Motion filed pursuant to 11 U.S.C. § 362(d) bears the initial burden of proving a prima facie case of entitlement to relief from the automatic stay before this relief can be granted. *In re Ronald Perlstein Enterprises, Inc.*, 70 B.R. 1005, 1007–08 (Bankr.E.D.Pa.1987); and *In re Stranahan Gear Co.*, 67 B.R. 834, 836–37 (Bankr.E.D.Pa.1986). Clearly, the CHA has not met this burden as to the issue of whether the Debtor here has failed to make post-petition rental payments on the record before us. Therefore, we cannot grant the CHA relief at this time, although we are of course not foreclosing the CHA from establishing a basis for relief under 11 U.S.C. § 362(d) on a subsequent record.

We must therefore enter an Order denying the CHA's Motion at this juncture, although we expressly do so without prejudice to the CHA to either file a praecipe to list its current Motion for a subsequent supplemental hearing or to file an entirely new § 362(d) Motion. We also shall grant the Debtor the permanent injunction which she requests in her adversarial proceeding.