**In re Ronald E. LUTZ and Sandra M. Lutz, Debtors.**

**SPRUCE LIMITED PARTNERSHIP t/a Spruce Park Apartments, Movant,**

**v.**

**Ronald E. LUTZ, Sandra M. Lutz, and Leon P. Haller, Trustee for the Estate, Respondents.**

**Bankruptcy No. 87–00173.**

United States Bankruptcy Court, M.D. Pennsylvania.

Feb. 17, 1988.

As Amended Feb. 22, 1988.

Joyce A. Nettke, Lebanon, Pa., for debtor.

John R. Kelsey, III, Lebanon, Pa., for Spruce Limited, movant.

Leon P. Haller, Harrisburg, Pa., for trustee.

## MEMORANDUM

ROBERT J. WOODSIDE, Bankruptcy Judge.

Before the court is the Motion of Spruce Limited Partnership t/a Spruce Park Apartments (hereinafter "Spruce Park") to Lift the Automatic Stay imposed by section 362 of the Bankruptcy Code. As the debtors' landlord, Spruce Park seeks to have the stay lifted so that it can resume state proceedings to evict the debtors for non payment of rent. The matter has been heard and briefed and is now ready for decision.

### Findings of Fact

Spruce Park is a limited partnership which participates in a subsidized housing program regulated by the U.S. Department

of Housing and Urban Development (hereinafter "HUD"). Pursuant to this program, Spruce Park enters into a lease (on a HUD approved form) directly with individual tenants. The tenant's monthly rent payment is determined pursuant to a HUD formula and varies according to the individual's income. The landlord also receives a subsidy directly from HUD. The subsidy, when added to the tenant's payment approximates the apartment's fair market. If the tenant does not pay a particular month's rent, the landlord, nevertheless, continues to receive the HUD subsidy for that month. HUD makes no payment to Spruce Park's tenants and the tenants make no rental payments to or for the benefit of HUD.

Under the terms of the lease, the landlord can terminate the lease agreement on the basis of the tenant's "material noncompliance" with the terms of the lease. Material noncompliance is defined to include "nonpayment of rent beyond any grace period available under State law." *See* Lease Agreement at ¶ 23, attached to Debtor's Hearing Memorandum.

In September of 1986, Mr. Ronald Lutz became unemployed. At that time Mr. And Mrs. Lutz were making rental payments in the amount of $309 per month. Mrs. Lutz's take home pay was about $80 to $90 per week. Due to their loss of income, the Lutzes were unable to make their rental payments and were soon notified of their delinquency in payment. Mrs. Lutz called the resident manager and was told to verify their loss of income in writing. Between October of 1986 and February of 1987, the Lutzes made some payments on their rental obligation but remained substantially in default.

On December 16, 1986, Spruce Park filed an eviction action in state court. A judgment for eviction was entered on January 5, 1987. This judgment was appealed to the Court of Common Pleas, and Spruce Park filed a complaint in that court on February 11, 1987.

On February 26, 1987 Mr. and Mrs. Lutz filed a petition under Chapter 13 of the Bankruptcy Code. They made no rental payments in March and April of 1987. In May, after receiving written verification of the Lutz's income change, Spruce Park lowered the debtors' rent to $145 per month. As of the date of the hearing on this matter, the debtors were current on rental obligations incurred since May of 1987.

### Discussion

The dispute in this case centers on the question of whether the debtors are obligated to pay the prepetition rent arrearages in order to continue to live at Spruce Park. Debtors argue that they may assume the lease without paying the prepetition rent arrearages. Under the debtors' analysis, the prepetition obligation would be discharged at the successful completion of their Chapter 13 plan. The nondiscrimination provisions of Section 525 of the Bankruptcy Code would, in turn, prohibit Spruce Park from taking any action to terminate the debtors' lease on the basis of the discharged prepetition debts.

Spruce Park, on the other hand, maintains that section 525 is inapplicable and that the debtors cannot assume their lease without first curing all prepetition defaults.

This court's analysis will begin with section 525 and its effect on the debtor's prepetition rental obligations. The court can then decide whether relief from the stay should be granted.

Section 525(a) of the Bankruptcy Code provides in relevant part:

a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, [or] discriminate with respect to such a grant against ... a person that is or has been a debtor under this title, solely because such ... debtor is or has been a debtor under this title, ... has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under

this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525.

In determining the applicability of this section, the first question to be addressed is whether Spruce Park is a governmental unit as defined in the Code. This determination is crucial for the Bankruptcy Code fails to accord to debtors protection against discrimination by private individuals or entities. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6322; S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S. Code Cong. & Admin.News 1978, p. 5867.

Paragraph 26 of 11 U.S.C. § 101 defines "governmental unit" to mean:

... United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government;

11 U.S.C. § 101(26). The legislative history of this section further specifies:

Paragraph [26] defines "governmental unit" in the broadest sense. The definition encompasses the United States, a State, Commonwealth, District, Territory, municipality, or foreign state, and a department, agency or instrumentality of any of these entities. "Department, agency, or instrumentality" does not include an entity that owes its existence to State action such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

H.Rep. No. 95–595, 95th Con., 1st Sess. 311 (1977), U.S.Code Cong. & Admin.News 1978, p. 6268; S.Rep. No. 989, 95th Cong., 2d Sess. 24 (1978), U.S.Code Cong. & Admin.News 1978, p. 5810.

The legislative history of section 525 indicates that the section would apply to such quasi governmental entities as state bar associations, medical societies and credit unions. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 366–67 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6321–6323; S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, p. 5867. Similarly, courts have extended the list to include state universities, municipal housing authorities and state liquor authorities. *See In re Marine Electric Railway Products Division, Inc.,* 17 B.R. 845, 849 (Bankr.N.Y.1982) and cases cited therein. This court is unaware of any cases, however, in which the term "governmental unit" was held to apply to private entities which merely receive public funds and are subject to governmental regulations. Cases which are most closely on point appear instead to view such entities as private.

In *Girardier v. Webster College,* 563 F.2d 1267 (8th Cir.1977), for example, the court found that a college which extended National Defense Student Loans to the debtor pursuant to the National Defense Education Act and implementing regulations was a private entity and was, therefore, not enjoined by bankruptcy law from discriminating against that debtor.

Similarly, in *Kentucky Central Insurance Company v. Lueking (In re Lueking )*, 58 B.R. 472 (Bankr.E.D.Tenn.1986), the court had to determine whether an insurance company which issued a Reclamation of Land bond on behalf of the debtor and in favor of the State of Tennessee Department of Conservation was a governmental unit. In that case, the court rejected the argument that "[t]he role played by the Plaintiff [insurance company]—a role indirectly created by law—is so essential to this statutory scheme [T.C.A. 59–8–201 et seq.] (legal prerequisites for and the regulations with respect to surface mining operations in Tennessee) that it is tantamount to a governmental service." 58 B.R. at 474.

■ In the present case, the record shows that Spruce Park is a privately

owned entity which participates in a federally regulated public housing program. Although Spruce Park receives a subsidy from HUD, it does not extend HUD money to the debtor and it does not collect any funds from the debtor on behalf of or for the benefit of the government. The debtors' failure to pay their prepetition rent, thus, harms Spruce Park, not the government. This court, accordingly, finds that Spruce Park is not a governmental unit as defined in the Bankruptcy Code and that Section 525, thus, does not apply in this case.

Even if Spruce Park were a governmental unit, this court would nevertheless find no violation of section 525.

Section 525 prohibits a governmental unit from denying, revoking, suspending or refusing to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against a person because that person filed for bankruptcy or failed to pay a debt that is dischargeable or discharged in bankruptcy.

The legislative history of this section makes clear that Congress intended to prevent governmental units from interfering with the debtor's discharge and opportunity for a fresh start as provided by federal bankruptcy laws. The House Report states:

> This section is additional debtor protection. It codifies the result of *Perez v. Campbell,* 402 U.S. 637 [91 S.Ct. 1704, 29 L.Ed.2d 233] (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.
>
> ... The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the *Perez* situation). It does not

prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as net capital rules, if applied nondiscriminatorily.

> In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.
>
> The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations contrary to the expressed policy.

H.Rep. No. 95–595, 95th Con., 1st Sess. 366–67 (1977), U.S.Code Cong. & Admin. News 1978, pp. 6321–6323; S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, p. 5867.

In analyzing the *Perez* decision, the court in *Johnson v. Edinboro State College,* 728 F.2d 163 (3d Cir.1984) noted:

> The Court in *Perez* made clear that it did not question the state's capacity to require proof of financial responsibility as a precondition for granting driving privileges. Rather the issue was "the power of a State to provid[e] that a discharge in bankruptcy of the automobile accident tort judgment shall have no effect on the judgment debtor's obligation to repay the judgment creditor ..." 402 U.S. at 643, 91 S.Ct. at 1708.

*Id.* at 165.

It is evident that the conduct which Congress intended to prohibit is discriminatory conduct. Congress sought to prevent governmental units from withholding from

debtors various grants and privileges as a means of coercing these individuals into paying debts which had been discharged under federal bankruptcy laws.

In addition, Congress sought to foster the "fresh start" policy of the Code by ensuring that debtors be given a "new opportunity" and "clear field" in life, unhampered by the "pressure and discouragement" of preexisting debt. *See Perez*, 402 U.S. at 648, 91 S.Ct. at 1710. A governmental unit's discrimination against a debtor, stemming either from some stigma associated with the fact that the person filed for bankruptcy or from the fact that the debtor had discharged a debt which had been owed to the governmental unit would, obviously, interfere with this "fresh start" policy.

■ Section 525 does not, however, prevent a governmental unit from taking actions which are not discriminatory and which are not based on an intent to collect a discharged debt. Thus, for example, in the case of *In re Goldrich*, 771 F.2d 28 (2nd Cir.1985), the court noted that Congress "acknowledged the possibility that a prior bankruptcy could be considered in evaluating financial responsibility as long as that consideration was done in a nondiscriminatory fashion." *Id.* at 31. The Court determined that "[w]here the decision at issue concerns a post-discharge application for credit, evaluation of financial responsibility is crucial. As long as the purpose of that examination is not to coerce the debtor into paying or reaffirming a discharged debt, the examination is permissible." *Id.* Similarly, in *Johnson v. Edinboro State College*, 728 F.2d 163 (3rd Cir.1984), the court found that a state university could withhold a debtor's transcripts from him in an effort to collect an unpaid student loan where the loan obligation was not dischargeable in bankruptcy.

■ Similarly, a governmental unit's act of terminating a contractual relationship with the debtor when the debtor has defaulted on his or her contractual obligation is not, necessarily, a discriminatory action prohibited by section 525. A debtor's right to require another party to continue to perform its obligations under an executory contract is governed by the terms of that contract. Where, because of the debtor's defaults, the contract excuses the landlord from any further performance and allows the landlord to terminate the contract, the debtor can have no legitimate expectation that the landlord will continue to maintain this contractual relationship. When the landlord, accordingly, elects to terminate its contractual relationship with the debtor, that act is not, in and of itself, discriminatory.

■ The fact that the debtors have received a discharge in bankruptcy does not alter this analysis. A discharge in bankruptcy relieves the debtors of personal liability for the missed payments. The landlord, thus, cannot bring an action against the debtors to collect those payments. This court finds no evidence in the Bankruptcy Code or its legislative history to indicate that the discharge was intended to cure defaults in leases or other executory contracts and thereby reinstate them. In fact, a debtor's right to "cure" defaults and thus, to require a creditor to continue to do business with that individual is carefully tailored to protect the creditor's economic interests. Section 365 of the Code allows a trustee to assume an executory contract only after both curing the default and providing adequate assurance of future performance. Section 1322(b)(6) of the Code allows the Chapter 13 debtor to assume an "executory contract or unexpired lease of the debtor" subject to the requirements of section 365. Similarly, section 1322(b)(5) of the Code specifically allows the debtor to provide in his plan for the "curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." 11 U.S.C. § 1322(b)(5). This court concludes that a debtor's discharge in bankruptcy eliminates only the debtor's personal liability for any defaults in a contractual obligation. A contractual provision allowing another party to the contract to terminate the agreement

upon the debtor's default remains effective unless applicable law permits the debtor to cure the default and the debtor, in fact, does so.

■ As indicated earlier, Section 525 of the Code is aimed at discriminatory treatment by governmental units. It does not cure contractual defaults and does not require governmental units to continue a contractual relationship with a debtor when, pursuant to the terms of that contract, the prepetition default constitutes cause for terminating the contractual relationship. Unless it is shown that the creditor was attempting to collect a prepetition debt, or was otherwise discriminating against the debtor, a governmental unit's termination of a lease based on a prepetition default is not *per se* a violation of section 525 of the Bankruptcy Code.[1]

In the present case, this court finds that Spruce Park has not engaged in any discriminatory behavior and has not attempted to collect a discharged debt. Spruce Park seeks to terminate the debtors' lease because the debtors, by not making their prepetition rent payments, have failed to comply with the terms of that agreement. The debtors have defaulted on their lease obligations and the lease agreement allows the landlord to terminate the lease on account of such default. The debtors have failed to show that Spruce Park seeks to terminate the lease out of a desire to collect its prepetition losses. Instead, it is evident that Spruce Park is merely seeking to terminate its economic relationship with these debtors.

This court, thus, finds that Spruce Park has not violated section 525 of the Code and is not required by that section to continue to abide by the parties' lease agreement irrespective of the debtors' defaults under that lease.

■ The remaining question to be decided is whether Spruce Park is entitled to relief from the automatic stay at this time. The record shows that the debtors are presently making their post petition rental payments in accordance with their proposed plan. In addition, Spruce Park has indicated that it continues to receive rental subsidies from the government regardless of whether the tenants are actually making their payments. This court, thus, finds no immediate cause for lifting the automatic stay.

As noted earlier, section 1322 of the Bankruptcy Code allows the Chapter 13 debtor to assume leases by curing defaults in accordance with section 365. This court believes the debtors should be allowed an opportunity to amend their plan to propose a method of paying off these prepetition arrearages. A final ruling on Spruce Park's automatic stay motion will, accordingly, be postponed to give the debtors an opportunity to propose such a repayment plan.

An appropriate order will be entered.

---

1. This court disagrees with the holding in *In re Sudler,* 71 B.R. 780 (Bankr.E.D.Pa.1987) that "the strong public policy of 11 U.S.C. § 525 overrides the potential requirement of 11 U.S.C. § 365(b)(1) that a debtor assuming a lease must cure any prepetition defaults or otherwise provide adequate protection to the landlord." *Id* at 787. That case cites as support the case of *In re Gibbs,* 9 B.R. 758, 763–64 (Bankr.D.Conn.1981); *reaff'd* 12 B.R. 737 (Bankr.D.Conn.1981); *aff'd* 76 B.R. 257 (D.Conn.1983). The *Gibbs* case involved a public housing authority which had terminated the lease before the debtor filed for bankruptcy and threatened to evict the debtor unless she paid a discharged prepetition debt. In affirming the bankruptcy court's decision, the district court expressly found that the case did *not* involve an executory contract. *See Gibbs,* 76 B.R. at 262. The cited case of *In re Knight,* 8 B.R. 925, 928–29 (Bankr.D.Md.1981) similarly, fails to support the *Sudler* court's holding. *Knight* held that a trustee's failure to assume a residential lease did not automatically constitute a breach of that lease under section 365 of the Code. Instead, the trustee's failure to assume merely constituted an abandonment of the estate's interest to the debtor. *See Knight,* 8 B.R. at 929. The court in *Knight* did not suggest that after the trustee had abandoned the estate's interest to the debtor, the landlord would be required to continue to lease the premises to the debtor regardless of whether or not that tenant had cured his or her prepetition defaults.