In re Francisco H. MARCANO, Debtor.

In re Joyce S. Gayle, Debtor.

Nos. 01–42520(ALG), 02–42349(ALG).

United States Bankruptcy Court,
S.D. New York.

Jan. 31, 2003.

Jacqueline M.H. Bukowski, New York City, for Francisco H. Marcano and Joyce S. Gayle.

Andrea Shapiro, Solomon & Bernstein, New York City, for 59 West 87th Street Tenants Association.

Candace C. Carponter, Law Offices of Candace C. Carponter, P.C., New York City, for Volunteers of America, Inc.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

The Court has consolidated, for purposes of this memorandum decision only, two motions for relief from the automatic stay filed in separate cases, *In re Marcano* (Case # 01–42520) and *In re Gayle* (Case # 02–42349). In each case the landlord seeks to enforce an eviction of the debtor that was pending on the date the case was filed. Both debtors argue, in opposition, that their landlords' attempts to evict them for nonpayment of dischargeable prepetition rent obligations are violative of

§ 525(a) of the United States Bankruptcy Code.

## DISCUSSION

### I. BACKGROUND

#### a. Francisco Marcano

Francisco Marcano ("Marcano") lives with his wife at 59 West 87th Street ("West 87th Street"). The Marcanos, an elderly couple, have a combined monthly income of $1068, all from Social Security.[1] They moved into West 87th Street in 1972 when they entered into a month-to-month lease. Their current monthly rent is $567.

The West 87th Street building is a residential building that was acquired by the City, through the West Side Urban Renewal Project, in the early 1960's for the purpose of renovation and maintenance as low-income housing. The City's Department of Housing Preservation and Development ("HPD") has administered the building through one of its divisions, the Division of Alternative Management Programs ("DAMP"). Over the years management of the building, under the supervision of DAMP, has been undertaken by different entities. In March 2000, after many years of suffering from deplorable conditions, including at times lack of heat, hot water and pest control, the tenants of West 87th Street applied to the City for inclusion in the Tenant Interim Lease Program ("TIL").

Under the TIL program, organized tenant associations in City-owned buildings enter into a lease with the City to maintain and manage the building. The tenant association uses all rental income to pay operating expenses and to maintain the building, while HPD funds the building's rehabilitation costs. Upon successful com-

---

1. Mr. Marcano receives $495 and Mrs. Marcano receives $238 plus an additional supplement of $335. (Debtor's Opposition Memo at Exh. 3–3C).

pletion of the TIL program, the tenant association, through a cooperative corporation, can purchase the building from the City. Individual tenants may thereafter purchase shares representing ownership of their apartments for the fixed sum of $250. When they filed their application to participate in the TIL program, the tenants of West 87th Street formed the 59 West 87th Street Tenants Association (the "TA"), the landlord herein. At present, the TA has been participating in the TIL program for approximately two years, but it has not yet purchased the building from the City.

On or about November 6, 2000 the TA instituted a summary proceeding in the Civil Court of the City of New York, New York County, seeking recovery of possession of the premises from the Marcanos based upon non-payment of rent.[2] On April 19, 2001, the TA and Marcano entered into a Stipulation in which Marcano consented to the entry of a final judgment in the amount of $11,171. Marcano further agreed to remit timely rent payments in the amount of $567, and in October 2001, he was to make a lump sum payment of $4,371 to the TA. Commencing in December 2001, Marcano was also to pay, along with his rent, an additional $200 per month for a period of thirty-four months. The Stipulation further provided for a warrant of eviction to issue upon motion to the court on eight days' prior notice of default.

Between April 2001 and August 2001, issues arose concerning Marcano's timeliness, and in some instances, his non-payment of amounts due under the stipulation. As a result the TA filed a motion in Civil Court for issuance of a warrant of eviction. Marcano cross-moved seeking injunctive relief on grounds that the TA had not provided rent receipts. On August 24, 2001, the Civil Court denied Marcano's cross-motion and granted the TA's motion for issuance of the warrant, and it was issued on September 27, 2001. Execution of the warrant of eviction, however, was stayed, provided Marcano timely paid the previously agreed upon amount as set forth in the Stipulation. On October 4, 2001, Marcano filed a petition under Chapter 7 of the Bankruptcy Code. Marcano has continued to occupy the apartment since he declared bankruptcy and has apparently paid post-petition rent, as the TA has not brought proceedings asserting nonpayment.

On December 4, 2001, the TA filed a motion for relief from stay on grounds that Marcano lacks equity in the apartment and that Marcano's case filing was allegedly made in bad faith. Marcano interposed an objection arguing that an eviction based on non-payment of rent would be violative of § 525(a) of the Bankruptcy Code. The motion was argued on January 11, 2002 and decision has awaited the results of *In re Stoltz*, 315 F.3d 80 (2d Cir.2002), discussed below.

**b. Joyce S. Gayle**

Joyce S. Gayle ("Gayle") is a 75–year old woman who lives alone in a small room located in the Brandon Residence, situated at 340 West 85th Street in New York City. Gayle receives a monthly income of $524 from Social Security that she is able to supplement with revenues she receives from a neighborhood dog-sitting business. Gayle began living at 340 West 85th Street in November 1, 1993 when she entered into a month-to-month lease with the landlord. Her current monthly rent is $678.

---

**2.** Although the record is not clear as to the exact amount owed by the Marcanos, it is assumed that it amounted to years of rent at the monthly rent. Most of the rent accrued during the many years the City directly managed the building—or as the tenants would presumably put it, mismanaged or at best neglected the building.

The residence provides non-transient dormitory-style living accommodations to women, eighteen years and older, who are currently working, visiting, students at area universities, or retired.

The landlord and owner of the above-described premises is Volunteers of America, Inc. ("VOA"), a national faith-based human service organization. Although VOA provides approximately fifty programs to address community needs, its primary mission is to alleviate the problem of homelessness. As of 2000, the majority of the VOA's approximately $70 million budget went to providing shelter services ($28,432,920) and housing services ($17,040,272) to New York City's homeless persons.[3] VOA is the largest private provider of services to the homeless in the New York metropolitan region.[4] VOA funds its programs through charitable contributions and public support ($1,279,298), but most of its funds come from government sources ($63,158,283).[5] However, according to the pleadings before the Court, the Brandon Residence is self-supporting and receives no government funding.

It is undisputed that from March of 1997 through February of 1998, Gayle failed to pay rent. As a result of Gayle's nonpayment, the VOA instituted summary proceedings in state court seeking the entry of a final money judgment for the rent arrears and possession of the apartment. On April 3, 1998, Gayle and VOA entered into a stipulation of settlement that awarded the Debtor a twenty percent rent abatement and provided that Gayle was to pay the balance of her arrearage by May 2, 1998. As Gayle was unable to make the payment called for under the stipulation, a judgment of possession was entered against her on May 27, 1998, and a warrant was issued in June of 1998. VOA requested that the City Marshal execute upon the warrant on or about September 23, 1998. After receiving notice of the proposed execution of the warrant, Gayle filed an order to show cause in state court to stay the eviction proceedings. The order to show cause was scheduled for hearing on October 23, 1998.

On October 13, 1998, Gayle filed for protection under Chapter 13 of the Bankruptcy Code.[6] VOA filed a motion for relief from the automatic stay returnable on December 23, 1998. On March 23, 1999, an order was entered conditionally granting VOA's motion. Under the terms of the Order, Gayle was to stay current on all post-petition rent; if she failed to meet her obligations, the landlord could settle an order vacating the stay. In April 1999, Gayle having failed to pay post-petition rent, VOA settled an order lifting the stay, but it was not signed because the Debtor brought her payments current. Gayle continued to be late in paying rent, VOA continued to settle orders lifting the stay, and the Debtor continued to make tardy rent payments from early 1999 through September 10, 2001, when an order was entered granting VOA relief from the stay. On January 14, 2002, an order was entered granting the Chapter 13 Trustee's motion to dismiss the case, with prejudice. Gayle's Chapter 13 case was closed on March 27, 2002.

In April 2002, VOA moved in state court to restore to the court's calendar Gayle's October 1998 Order to Show Cause, seek-

**3.** Figures taken from the VOA's Statement of Activities for the years 1999 and 2000, attached to Debtor's Memo of Law in Further Support of a Motion to Dismiss ("Support Memo") as exhibit D-1.

**4.** *Id.,* at exhibit B.

**5.** *Id.,* at exhibit D-1.

**6.** Docket number 98-47338(CB).

ing to vacate the prior warrant of eviction. In opposition to VOA's motion to restore the matter to the calendar, the Debtor cross-moved, claiming the following: (i) VOA's motion should be denied because Gayle was in the hospital; (ii) the proceeding should be dismissed as stale and/or a violation of her rights of due process; (iii) proceedings should be dismissed because room rates were not posted in the lobby; (iv) proceedings should be dismissed because the claimed arrearage was for "food services"; (v) a full rent abatement should be awarded due to continuing rent-impairing violations; and (vi) a full abatement and treble damages should be granted for the landlord's alleged violation of General Business Law § 206 (which requires hotel and inn keepers to post room rates conspicuously). On May 31, 2002, the state court rendered a decision and order ruling in favor of VOA and finding that Gayle's arguments lacked merit. The court stayed execution of the warrant until June 10, 2002 to allow the Debtor "the opportunity to leave with dignity." (VOA Motion Exh. A at 4.)

Although the Debtor received another stay of eviction, on July 12, 2002, the state court issued another order finding that "there is no legal [basis] for the court to further exercise its discretion to stay the warrant." (VOA Motion Exh. B.) The warrant was stayed until July 22, 2002 to allow Gayle to find assistance, if possible.

On July 23, 2002, Gayle filed a petition under Chapter 7 of the Bankruptcy Code. At the time of filing her petition, the Debtor owed approximately $21,272.85 to VOA for rent from 1998 through July 2002.[7] On July 31, 2002, VOA filed a motion seeking relief from the stay and an order compelling the debtor to pay full use and occupancy payments. Gayle cross-moved on August 9, 2002, seeking dismissal of the Landlord's motion as violative of § 525(a) of the Bankruptcy Code, a rent abatement, and an order finding the rent, which exceeds thirty-percent of Gayle's income, an unconstitutional taking. Decision on this motion has also awaited the Circuit Court's opinion in *Stoltz.*

## II. THE MOTIONS FOR RELIEF FROM STAY

The TA and the VOA (collectively referred to as the "Landlords") have submitted separate motions for relief from the stay but argue for relief on similar grounds. Both Landlords assert that relief from the automatic stay should be granted under § 362(d)(2), as Marcano and Gayle (collectively referred to as the "Debtors") lack equity in the respective properties and the properties are not needed for an effective reorganization. The tenants also argue against the motions on similar grounds (they are represented by the same attorney).

■ In an individual Chapter 7 case, a residential lease is considered property of the bankruptcy estate, *see* 11 U.S.C. § 541, but a Chapter 7 trustee generally has no interest in administering the lease or other tenancy interest as it adds no value to the estate. As a result, any rights will eventually revert to the debtor. Often, as in the instant matter, a Chapter 7 trustee will effectuate an "abandonment" of the lease by failing to assume it during the first sixty days after the order of relief. *See* 11 U.S.C. § 365(d)(1). Such inaction constitutes a rejection of the lease, but the reversion to the debtor is not automatic.

---

7. Gayle's Schedule F. At the time the VOA's motion for relief from the stay was filed, the amount owed was estimated at $23,743. Although the record may not be complete, it appears that Gayle has paid all or substantially all post-petition rent or use and occupancy during the pending of this motion, at the rent level that was in effect as of July 1998.

Pursuant to § 554(c) of the Bankruptcy Code, if the trustee does not administer the lease, the lease is deemed abandoned to the debtor "at the time of the closing of the case." 11 U.S.C. § 554(c); *see also In re Henderson,* 245 B.R. 449, 454 (Bankr. S.D.N.Y.2000); *In re Touloumis,* 170 B.R. 825, 828 (Bankr.S.D.N.Y.1994). The underlying cases are still open; therefore, the respective leases have not yet reverted to the Debtors and the automatic stay remains in effect. See also 11 U.S.C. § 362(c), providing that the stay of an act against property of the estate continues "until such property is no longer property of the estate."

■ Relief from the stay may be granted upon cause shown. 11 U.S.C. § 362(d)(1). Alternatively, a movant may obtain relief by establishing that the debtor lacks equity in the property and the property is not needed for an effective reorganization. 11 U.S.C. § 362(d)(2). While the subsections of § 362 are disjunctive, the Landlords have argued that they are entitled to relief from the stay under both. To grant the requested relief, it is sufficient for the Court to find that the Landlords have met their burden under one.

■ The instant petitions seek relief under Chapter 7, and therefore it is axiomatic that the respective properties are not needed for an effective reorganization. In addition, in both cases under review, when the Debtors filed their petitions, the New York state court had already issued warrants of eviction against them. While the automatic stay protects occupancy rights alone, the usual rule under New York law is that the issuance of a warrant terminates the landlord/tenant relationship. *See Bell v. Alden Owners, Inc.,* 199 B.R. 451, 458 (S.D.N.Y.1996); *In re Darwin,* 22 B.R. 259, 263 (Bankr.E.D.N.Y.1982); *In re Issa Corp.,* 142 B.R. 75, 78 (Bankr. S.D.N.Y.1992) (bankruptcy court must give preclusive effect to a state court's judgment terminating a lease prepetition and awarding possession to the landlord); *see also In re W.A.S. Food Service Corp.,* 49 B.R. 969, 973 (Bankr.S.D.N.Y.1985) (continuing the stay for a "reasonable period of time" for tenant to seek *vacatur* of the warrant or to renegotiate with the landlord); *In re Eclair Bakery Ltd.,* 255 B.R. 121, 136 (Bankr.S.D.N.Y.2000)("where state court litigation is not pending or in the cards, or where the debtor has failed to show any basis for a belief that the state court will grant relief, the prepetition termination of the landlord-tenant relationship will at least normally provide cause for relief from the stay").[8]

Under the usual circumstances, the Court's analysis would end here as the aforementioned facts provide grounds sufficient to support relief from stay. However, the Debtors have each objected on the ground that eviction for non-payment of rent that has been or will be discharged would constitute a violation of § 525(a) of the Bankruptcy Code.

## III. DEBTORS' OBJECTIONS

### a. Applicability of § 525(a) of the Bankruptcy Code

#### i. Bankruptcy Code § 525(a)

■ Section 525(a) of the Bankruptcy Code provides in pertinent part that "a

---

8. Even if a warrant had not already issued in state court proceedings, a tenant may be evicted on account of a prepetition arrearage for failure to comply with the covenant to pay rent, albeit the arrearage cannot be collected by the landlord as a money judgment. As such, it would be a debt discharged in the bankruptcy case. *In re Touloumis,* 170 B.R. 825, 830 (Bankr.S.D.N.Y.1994); *see also Spruce Limited Partnership v. Lutz,* 82 B.R. 699, 704 (Bankr.M.D.Pa.1988).

governmental unit may not deny, revoke, suspend, or refuse to renew a license . . . or other similar grant [or] . . . discriminate with respect to such a grant against . . . a person that is or has been a debtor under this title . . . solely because such bankrupt or debtor is or has been a debtor under this title . . . or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act." 11 U.S.C. § 525(a). Section 525(a) is intended to safeguard the Congressional policy of a fresh start for debtors that could otherwise be frustrated if government entities were permitted to discriminate against debtors solely because they are or were debtors under the Bankruptcy Code. *See* H. REP. No. 95–595, 95th Cong., 1st Sess. 366–67 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6321–23; S.REP. No. 989, 95th Cong., 2d Sess. 81 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5867.

As noted above, the Second Circuit has had pending before it the issue whether a public housing tenant can be evicted because of a lease rejection under § 365 of the Bankruptcy Code and the failure of the tenant to fulfill the covenant to pay rent, or whether the provisions of § 525(a) control and preclude a housing authority from discriminating against the tenant on account of a dischargeable rent arrearage. In *In re Stoltz*, 315 F.3d 80 (2d Cir.2002), the Circuit Court held that § 525(a) protects debtor-tenants in public housing from eviction on the basis of nonpayment of discharged pre-petition rent. "To the extent sections 525(a) and 365 of the Bankruptcy Code conflict, the rules of statutory construction and sound bankruptcy policy dictate that § 525(a) must prevail. [The housing authority] is therefore permanently enjoined from enforcing its judgment for possession against Stoltz." *Id.* at 95.

In reaching its conclusion, the Circuit Court first found that § 525(a) had been construed by the courts "to protect debtors from discrimination in a wide variety of contexts," *id.* at 87. The Court held that eviction of a public housing tenant on the ground of nonpayment of a discharged prepetition rent obligation would deprive the tenant of a grant—a rent subsidy and a property interest unobtainable from the private sector—that is "similar" to a "license, permit, charter [or] franchise" within the meaning of § 525(a). *Id.* at 90. Such discrimination, the Court determined, would provide the housing authority with little benefit but would have a devastating effect on the tenant and on the policy of affording a debtor a "fresh start." *Id.* at 94, citing *In re Bogdanovich*, 292 F.3d 104, 107 (2d Cir.2002).

██ *Stoltz* thus establishes in this Circuit that § 525(a) prohibits landlords that are *governmental units* from evicting debtor-tenants solely because of nonpayment of dischargeable prepetition debt. Conversely, § 365 authorizes landlords, in general, to exercise the state law remedy of eviction with respect to rejected leases, and they are not bound by § 525(a). There was no issue that the housing authority involved in *Stoltz* was a "governmental unit." *Stoltz*, at 88. In this case the principal issue for decision in light of *Stoltz* is whether the TA and VOA are "governmental units" within the meaning of § 101(27) of the Bankruptcy Code.

### ii. "Governmental unit"

Section 101(27) of the Bankruptcy Code defines "governmental unit" as the "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . a State, a commonwealth, a District, a Territory, a municipality, or a foreign state; or other

foreign or domestic government." 11 U.S.C. § 101(27). Marcano and Gayle both argue in substance that their landlords are "instrumentalities" of the state or local governments and are bound by the strictures of § 525(a). Marcano argues that § 525(a) bars the TA's motion because the City, through the TIL program, is "entwined" with the landlord and the premises. Gayle argues that the VOA, a tax exempt, not-for-profit, charitable organization that receives government funding to provide services to the homeless, is imbued with a "public purpose." Both landlords assert they are not "governmental units" subject to the requirements of § 525(a).

■ In considering the proper construction of the term "governmental unit," " '[l]egislative history suggests that Congress intended to define 'governmental unit' in the broadest sense.' " *T I Federal Credit Union v. DelBonis,* 72 F.3d 921, 930–31 (1st Cir.1995), quoting from the House Report accompanying the bill that became the Bankruptcy Reform Act of 1978, H. REP. No. 95–595, 95th Cong., 1st Sess. (1977) at 311, U.S.Code Cong. & Admin.News 1978, 5963, 6268 (reprinted in App. 2 Collier on Bankruptcy, pt. II (15th ed.1995)). *Stoltz* also stresses that the "legislative history specifically rejects a narrow construction of the anti-discrimination provision." *Stoltz,* at 92, n. 6. The Court there specifically relied on the history set forth in the House Report, noting that § 525(a) evolved from *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), in which the Supreme Court struck down a state statute that denied a license to debtors who had failed to satisfy motor-vehicle-related tort judgments against them, even if the judgment had been discharged in bankruptcy. The *Stoltz* opinion in particular quoted the section of the House Report that stated,

"The courts have been developing the *Perez* rule. This section [that became § 525(a) ] permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a state bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the unions credit union." H. REP. No. 95–595 at 367 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6323, quoted in *Stoltz* at 92, n. 6.

The Senate Report on the Senate version of the Bankruptcy Reform Act, which also contained a provision virtually identical to § 525(a) as finally adopted, had similar language, referring to "further development to prohibit actions by governmental or quasi-governmental organizations ..." and containing the same examples. S.REP. No. 989 95th Cong, 2d Sess. at 81, reprinted in 1978 U.S.Code Corp. & Ad. News 5787, 5867. Both the House and Senate Reports also state that the term "governmental unit" is not intended to encompass "an entity that owes its existence to state action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an *active one* in which the department, agency, or instrumentality is actually carrying out some government function." H. REP. No. 95–595, 95th Cong., 1st Sess. 311 (1977), U.S.Code Cong. & Admin.News 1978, 5963, 6268; S.REP. No. 989, 95th Cong., 2d Sess. 24 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5810 (emphasis added). Nevertheless, the thrust of both reports is that the term should be broadly construed.

The courts have generally construed the term in light of this history. In *T I Federal Credit Union v. DelBonis, supra,* the

court held that federal credit unions were "governmental units" as they perform an important "governmental function" by enabling "the federal government to make credit available to millions of working class Americans." 72 F.3d at 931–32.[9] "Government unit" also has been held to include utility commissions, *In re Begley,* 46 B.R. 707 (E.D.Pa.1984) (the Pennsylvania Public Utility Commission); transit authorities, *In re Marine Electric Railway Products Division, Inc.,* 17 B.R. 845 (Bankr.E.D.N.Y.1982) (New York City Transit Authority); liquor authorities, *In re Maley,* 9 B.R. 832 (Bankr.W.D.N.Y. 1981); and state universities, *In re Howren,* 10 B.R. 303 (Bankr.D.Kan.1980). *See also Matter of Kent,* 190 B.R. 196 (Bankr. D.N.J.1995) (the Joint Underwriting Association and Market Transit Facility, entities created pursuant to the New Jersey Automobile Reparation Reform Act and the Fair Automobile Insurance Reform Act, respectively, are government entities for purposes of § 523(a)(7)); *Betts v. Attorney Registration and Disciplinary Comm'n,* 165 B.R. 870 (N.D.Ill.1994) (finding the Attorney Registration and Disciplinary Commission a governmental unit for § 523(a)(7) purposes), *aff'd,* 51 F.3d 275, 1995 WL 108940 (7th Cir.1995), *cert. denied,* 516 U.S. 1012, 116 S.Ct. 571, 133 L.Ed.2d 495 (1995).

On the other hand, the term "governmental unit" has been construed not to include a private, nonprofit community services organization financed exclusively by federal and state grants, *In re Joliet–Will County Community Action Agency,* 847 F.2d 430 (7th Cir.1988)[10]; or a private landlord that received a subsidy under the "section 8" program from the Federal Department of Housing and Urban Development, *In re Lutz,* 82 B.R. 699 (Bankr. M.D.Pa.1988); or a privately owned real estate management and development firm that received a similar subsidy, *In re Rosemond,* 105 B.R. 8 (Bankr.W.D.Pa.1989); *In re Liggins,* 145 B.R. 227 (Bankr. E.D.Va.1992) (same); or a private mortgage company approved under the HUD federal mortgage insurance program, *In re Merriweather,* 185 B.R. 235 (Bankr. S.D.Tex.1995). It has also been construed not to include a private nongovernmental association of members that accredits schools, *In re Draughon Training Institute, Inc.,* 119 B.R. 927 (Bankr.W.D.La. 1990); a private radio station, *In re Coachlight Dinner Theatre of Nanuet, Inc.,* 8 B.R. 657 (Bankr.S.D.N.Y.1981), and an environmental public interest membership organization. *In re Revere Copper & Brass, Inc.,* 32 B.R. 725 (S.D.N.Y.1983).

■ As indicated above, the legislative history of §§ 101(27) and 525(a) demonstrates that Congress intended the term "governmental unit" to encompass entities that perform a "public function" as well as quasi-governmental entities that perform functions that can "seriously affect" a debtor's livelihood or fresh start. Such ostensibly private entities are also treated as if they were instrumentalities of the state in respect of the fundamental ban on discrimination contained in the Fourteenth Amendment. U.S. CONST. amend. XIV. Accordingly, the substantial body of law construing the term "state action" as used in Fourteenth Amendment jurisprudence should be relevant in determining whether the TA or VOA is a "governmental unit" within the meaning of § 101(27) and pro-

---

**9.** In that case the issue was whether the credit union was a "governmental unit" under § 523(a)(7)(B).

**10.** The issue in this case did not involve § 525(a) but whether the entity was a "governmental unit" ineligible to file a bankruptcy petition under §§ 101(41) and 109 of the Bankruptcy Code.

hibited by § 525(a) from discriminating against a debtor on account of a dischargeable prepetition debt.

The Supreme Court wrote extensively on state action in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). There the Court reviewed its prior opinions in cases where, despite differing fact patterns, the Court held that the action of an ostensibly private entity nevertheless constituted state action. *Brentwood Academy* discusses three different tests for state action. The tests most relevant here are the "public function" test and the "symbiotic relationship" test, or in the language of *Brentwood Academy*, "entwinement" between the government and the non-governmental entity.[11] Marcano grounds his argument that the TA should be considered a governmental unit on the control and influence the City exercises over his landlord's affairs by virtue of the TIL program. Gayle relies on VOA's corporate purpose and its role as the largest provider of homeless services in New York City as indicia of a "public function". Gayle specifically alleges that the VOA, through its efforts to alleviate the City's homeless dilemma, is serving an important "public purpose ... [and] is entwined with [a] municipal purpose"; the VOA's "public purpose" is thus the crux of this Debtor's argument that the VOA should be considered a "governmental unit". The contentions of each Debtor must be considered separately.

### b. The TA and Entwinement

■ In 1961, in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the Supreme Court held that when a State "has so far insinuated itself into a position of interdependence with [a purported private organization] it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth Amendment." *Burton*, 365 U.S. at 725, 81 S.Ct. 856. In *Brentwood Academy*, the Supreme Court reaffirmed this principle when it held "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Academy*, 531 U.S. at 295, 121 S.Ct. 924 (citation and internal quotations omitted).

The key facts in the relationship between the Tenants Association and New York City for purposes of determining whether the TA is a "governmental unit" are the following. West 87th Street, like all buildings participating in the TIL program, is owned by the City; however, the City's involvement goes far beyond simple ownership. The City, through one of its agencies, controls a tenant association's activities during the program and up until a year after the sale of the building. For example, during the term of the lease through the first year of ownership, DAMP sets tenants' rent and is authorized to periodically approve or impose rent increases. 28 RCNY § 14–01(b) (2001). All tenants of DAMP buildings are subject to the terms and conditions of tenancy as set forth in 28 RCNY § 21–24, as opposed to terms that may be included in a written lease with the building's management.[12]

---

**11.** The other test is the "coercion/compulsion" test, employed when a state exercises coercive power or provides significant encouragement for the actor to perform certain functions.

**12.** All tenants of buildings in DAMP are month-to-month tenants. 28 RCNY § 21–

The tenant associations themselves are given only a transitory, or "interim," lease that contain conditions that the lessees must meet to remain in the TIL program, such as providing DAMP access to the lessee's bank account and the funds contained therein and allowing DAMP unhindered access to the premises. A tenant association is required to submit monthly reports, and HPD/DAMP may inspect the building's leases, records and bills without prior notice to the lessee. Even after purchased from the City, the property cannot be disposed of without prior approval from the Commissioner of Housing Preservation and Development. As the lessees gain experience in managing the buildings, and the buildings become self-sustaining (i.e., rents cover operating and maintenance costs), a building can be sold to the tenants as a cooperative. During the term of the lease, however, even when a tenant association ostensibly manages the building's day-to-day affairs, DAMP is charged with supervising all of its activities.

■ Where there exists such pervasive entwinement of the City in the workings and composition of a nominally private tenant's association, the entity should be considered an instrumentality of the City and a governmental unit for purposes of 11 U.S.C. § 525(a). *See Brentwood Academy*, 531 U.S. at 302, 121 S.Ct. 924 ("Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards"). Indeed, the New York courts have consistently found state action in the action of tenants associations under the TIL program. *512 East 11th Street HDFC v.*

*Grimmet,* 181 A.D.2d 488, 581 N.Y.S.2d 24 (1st Dept.1992) (finding that the government is sufficiently entwined with a TIL building so as to trigger constitutional due process protections); *157 West 123rd St. Tenants Assn. v. Hickson,* 142 Misc.2d 984, 985, 542 N.Y.S.2d 900 (App. Term 1st Dept.1989) ("While the TIL program is transitory in nature, the City oversees [the tenant association's] activities and operation, monitors its building management skills, sets initial rents and approves subsequent rent increases, and must approve the commencement of holdover proceedings. Thus, the City is so 'entwined' with the conduct of the program as to constitute significant and meaningful government participation, triggering constitutional due process guarantees."); *Johnson v. City of New York,* 152 Misc.2d 576, 578 N.Y.S.2d 977 (Sup.Ct.1991) (the City's involvement with the TIL program is sufficient to constitute state action); *City of New York v. Currie,* 125 Misc.2d 291, 479 N.Y.S.2d 300 (N.Y.Co.1984) (same). *See also, Fuller v. Urstadt,* 28 N.Y.2d 315, 270 N.E.2d 321, 321 N.Y.S.2d 601 (1971) (finding the "ingredients of State action ... remarkable and multiple" in the case of a privately-owned apartment project that received State assistance through a State-supervised, private, limited profit housing company).

Under these cases, where the State is so clearly "entwined" with the tenant association that the tenant has a right to due process before being evicted, it would be anomalous to conclude that the TA is not a "governmental unit" for purposes of the anti-discrimination provisions of § 525(a). This is especially so in that most or all of the rent arrearage that was payable under

23(a) (2001). No party in this case introduced evidence of an actual lease signed by Marcano and the TA, and accordingly the Court views him as a month-to-month tenant having certain rights to continued possession

as mandated under state law. *See 512 East 11th Street HDFC v. Grimmet,* 181 A.D.2d 488, 581 N.Y.S.2d 24 (1st Dept.1992), discussed below.

the stipulation whose breach prompted the eviction accumulated before the TA was formed. This was an arrearage owing to the City, and there is nothing in the record to indicate that the TA paid anything to the City for it. The TA asserted in this case that the other tenants would benefit from an eviction of the Marcanos because a new tenant could be charged a slightly higher rent, but surely this result could be achieved at less cost than through an eviction of the Marcanos. The TA's ability to collect the arrearage would be a windfall, and it is truly a surrogate for the City in its non-payment proceeding against the Marcanos.

The analysis suggested by the court in *Matter of Kent* leads to the same conclusion. The *Kent* court identified the following "illustrative characteristics" that assist in the determination whether an entity is a governmental unit: (1) the creation of the entity; (2) the purpose of the entity; (3) the operation of the entity; (4) the rights and liabilities of the entity; (5) the dissolution of the entity. 190 B.R. at 204. While tenant associations involved in the TIL program are formed by private individuals, their motivation for banning together is to meet the City's requirements for participation in the TIL program. After forming the association, the City must recognize it and accept it as a TIL participant, at which point the association is subject to control and pervasive supervision by DAMP. As a TIL participant, the tenant association is performing a government function in that it is managing the day-to-day operations of a City-owned building—a benefit that clearly inures to the City. Although the record does not show whether the City has the power to dissolve the association, it can cancel its lease and in effect terminate its activities. In sum, the relationship between the Tenant Association and the City also exhibits most of the "illustrative characteristics" detailed in *Kent* so as to require a determination that the TA is a "governmental unit" subject to § 525(a) of the Bankruptcy Code.[13]

### c. Public Function and the VOA

■ Gayle has not argued that the City or State has so "entwined" itself into the operations of VOA that the actions of VOA should be considered "state action" or the acts of a governmental unit. She argues that VOA plays a critical "public function" and that its acts are the acts of the state under the public function test.

The Supreme Court elucidated the public function test in *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), which involved a private school that provided education to maladjusted high school students. Students were referred to the school by public school committees that, upon making the referral, funded the students' education. The school also received funds from other state and federal agencies that, cumulatively, provided approximately ninety percent of the school's operating funds. The petitioner, an ex-employee, relying on the school's receipt of government funding, filed suit alleging that the school acted under color of state law when it discharged her.

The Supreme Court held that notwithstanding the school's performance of a public function, there existed no grounds to support a finding of state action unless

---

**13.** In further support of its motion, the TA argues that Marcano's filing was made in bad faith. The TA asserts that Marcano filed his petition for the sole purpose of avoiding eviction. It is well settled that the filing of a bankruptcy petition, even on the eve of an eviction, does not, by itself, constitute a bad faith filing, nor is it a sufficient basis to grant relief from stay. *See In re Éclair Bakery, Ltd.,* 255 B.R. at 137, citing *In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr.S.D.N.Y. 1997).

the function performed had been "'traditionally the *exclusive* prerogative of the State.'" *Rendell–Baker*, at 842, 102 S.Ct. 2764, citing *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The Court went on to explain that receipt of public funds alone does not convert private acts to state acts. In light of this authority, the fact that VOA receives extensive government funds cannot support a finding that VOA is a governmental unit, without even considering the fact that it is uncontested on this record that the Debtor's residence is self-funded and does not rely on public subsidies. Those cases that have construed the term "governmental unit" in the housing context have also rejected the proposition that a private landlord is a "governmental unit" even if it receives a Federal rent subsidy. *See In re Lutz*, 82 B.R. 699 (Bankr.M.D.Pa.1988); *In re Liggins*, 145 B.R. 227 (Bankr.E.D.Va.1992); *In re Rosemond*, 105 B.R. 8 (Bankr.W.D.Pa.1989).

The Debtor argues that VOA is a governmental unit fulfilling a public function because of its tax exempt status. The Second Circuit, in discussing the difference between public and private action, has found that it is erroneous to "attribute the public stake in [a charity] to its tax-exempt status [for] ... The true origin of the public aspect of [a charity] lies in the nature of its activity." *Jackson v. The Statler Foundation*, 496 F.2d 623, 627 n. 6 (1973), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397, (1975); *see also Bob Jones University v. United States*, 461 U.S. 574, 590, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). A multitude of organizations maintain a tax-exempt status—churches, institutes, educational foundations, scientific organizations—but none of these has been deemed a state actor based purely on its tax-exempt status.

As noted above, the Supreme Court in *Rendell–Baker* held that state action can only be found where the public function involved has been traditionally the exclusive prerogative of the State. It is undisputed that VOA provides a needed function that benefits the public. However, the fact "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. 2764. Notwithstanding its critical importance to life and health, "housing is not a function essentially reserved for the State." *Young v. Halle Housing Assoc.*, 152 F.Supp.2d 355, 365 (S.D.N.Y.2001). There the Court continued, "Even if, as plaintiffs contend and defendants dispute, New York constitutionally mandates the provision of low-cost housing for the needy, this fact alone would be insufficient to establish that the provision of low-cost housing is the traditional or exclusive preserve of the State. The public function doctrine reaches only those powers exclusively 'associated with sovereignty' that are delegated to private actors." (citations omitted).

■ Based on the foregoing, it is concluded that there are no grounds upon which to base a finding that the VOA is a "governmental unit" in that its relationship to the State, to the extent that it has one, is not an "active one in which [it] is actually carrying out some government function." S.Rep. No. 989, 95th Cong., 2d Sess. 24 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5810.[14]

---

**14.** It should be noted that in the description of § 525(a) contained in both the House and Senate Reports, it is stated that the term "governmental unit" would include "other organizations that can seriously affect the debtor's livelihood or fresh start, such as exclusion from a union...." Since a labor union has traditionally been considered a private, non-governmental entity, *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir.2002),

## IV. GAYLE'S REMAINING ARGUMENTS

### a. Unconstitutional Taking

Gayle also argues that the rent charged by VOA is in excess of 100 percent of her income and is therefore an unconstitutional taking. She cites *Binghamton Housing Authority v. Douglas,* 217 A.D.2d 897, 630 N.Y.S.2d 144 (3d Dep't 1995), in support of this argument, but *Douglas* involved rent regulation of housing projects that participate in the federal public housing program. The Brandon Residence does not participate in a federal public housing program, and it is not subject to the rent regulations imposed on such participants. *See also Halle Housing Assoc.,* 152 F.Supp.2d at 365.

### b. Rent Abetement

■ Gayle also argues that she is entitled to a rent abatement due to conditions in the building. On April 3, 1998, Gayle entered into a stipulation with VOA wherein she received a twenty percent rent abatement in "full satisfaction of all rent abatement claims" against VOA. (Debtor's Cross–Motion Exh. C.) As the rent abatement claims were settled by virtue of the stipulation, the Debtor is now barred from re-litigating these claims here. *See Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.,* 2002 WL 1610923, at *6, 2002 U.S. Dist. LEXIS 13218, at *20 (S.D.N.Y.2002); *Bell v. Alden Owners, Inc.,* 199 B.R. at 458.

## CONCLUSION

*Gayle*

In light of the above, Gayle's objections to the VOA's motion for relief from the stay must be overruled. VOA may settle an appropriate order on five days' notice.

*Marcano*

Marcano is seemingly entitled to the same relief as Stoltz, an order whereby the TA would be "permanently adjoined from enforcing its judgment for possession...." *See Stoltz,* at 95. There remains, however, the question whether Marcano can be afforded any relief at all. As noted above, the issuance of a warrant of eviction is generally considered a termination of the landlord/tenant relationship, and a warrant issued against Marcano prior to their filing under Chapter 7.

■ Notwithstanding the issuance of a warrant, the tenant still retains "an equitable interest in the property, and the potential to reinstate the landlord-tenant relationship." *In re Issa Corp.,* 142 B.R. at 75. The summary proceeding remains open, and the state court retains the ability to vacate the warrant and order a tenant reinstated at least until actual execution of the warrant. N.Y. R.P.A.P.L. § 749(3); *see also In re Reinhardt,* 209 B.R. 183, 186–87 (Bankr.S.D.N.Y.1997); *In re Richards Pontiac,* 6 B.R. 773 (Bankr.E.D.N.Y. 1980) and cases cited; *Iltit Assoc. v. Sterner,* 63 A.D.2d 600, 405 N.Y.S.2d 68, 69 (1st Dep't 1978); *Brooklyn Urban Dev. Corp. v. Copeland,* 122 Misc.2d 726, 471 N.Y.S.2d 989 (1984). In appropriate cases, bankruptcy courts have continued the automatic stay of § 362 in order to give the tenant an opportunity to seek an order from the state court vacating a warrant of eviction. *In re W.A.S. Food Service Corp.,*

---

this reference at least indicates the possibility that the term "governmental unit" should be construed to include a private entity. It is clear, however, that a reference in the legislative history cannot change a statute that is plain on its face, *United States v. Ron Pair*

*Enterprises, Inc.,* 489 U.S. 235, 244, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), and the term "governmental unit" cannot be stretched so far as to include an organization such as the VOA in its role as landlord.

49 B.R. at 973. In a 1999 opinion in the *Stoltz* dispute, the Second Circuit also found that at the time a judgment of possession was entered against the tenant under Vermont law, Stoltz had "the right to vacate the judgment of possession by curing the default.... This right was preserved by the granting of the automatic stay. Thus, she continues to be in lawful possession of the Apartment." *In re Stoltz*, 197 F.3d 625, 630 (2d Cir.1999).

In the instant case, Marcano is also in lawful possession and has the right to redeem by curing defaults. As he also has the right to due process of law before being evicted, *see 512 East 11th Street HDFC* and other cases cited above, he may, if he is so advised, seek an order from the state court vacating the warrant of eviction on the ground of superceding Federal law that would forbid the act sought by the TA. On the other hand, under the circumstances of this matter, the same injunction as in *Stoltz* would appear to provide Marcano with adequate and appropriate relief. In earlier proceedings, the state court itself entered an order prior to the bankruptcy filing staying execution of the warrant of eviction, provided that Marcano timely paid the previously agreed amount as set forth in the Stipulation. Since that arrearage is a dischargeable debt under § 525(a) and the TA cannot deprive Marcano of his rights based thereon, the stay of execution of the warrant should remain in effect notwithstanding Marcano's failure to satisfy the condition therein providing for payment of the arrearage.

Counsel for Marcano is directed to settle an appropriate order on five days' notice.