**In re Thomas Vincent OKSENTOWICZ,**
**Debtor.**

No. 03–46502–R.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Sept. 23, 2004.

Jeffrey J. Randa, Mt. Clemens, MI, for Debtor.

*Opinion Regarding Debtor's Motion Seeking Relief for Violations of the Anti-Discrimination Provisions of the Bankruptcy Code by New Baltimore Place Apartments*

STEVEN W. RHODES, Chief Judge.

### I.

The debtor, Thomas Oksentowicz, filed for chapter 7 relief on March 7, 2003. His discharge was granted on June 12, 2003. Oksentowicz subsequently submitted a

rental application at the New Baltimore Place Apartments, a federally subsidized senior apartment complex. On December 22, 2003, Oksentowicz received a letter from New Baltimore Place indicating that his rental application had been denied because his credit report did not meet their standards for occupancy.

Oksentowicz filed this motion alleging a violation of the anti-discrimination provisions of 11 U.S.C. § 525(a). The debtor seeks monetary relief and an order requiring New Baltimore Place to accept his housing application.

New Baltimore Place filed a response arguing that § 525(a) does not apply because it is not a governmental unit. New Baltimore Place further asserted that Oksentowicz's application was not denied solely on the basis of his bankruptcy filing, as required for a violation of § 525(a).

Following a hearing on July 26, 2004, the Court requested an additional brief from New Baltimore Place and took the matter under advisement. The Court now concludes that New Baltimore Place violated the discharge injunction of § 525(a).

## II.

Section 525(a) states, in relevant part:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525(a).

This section "helps to ensure the 'fresh start' policy of the Code by prohibiting governmental entities from refusing to deal with or denying a certain property interest to a debtor due to his or her bankruptcy filing." *See In re Valentin*, 309 B.R. 715, 720 (Bankr.E.D.Pa.2004) (citing *In re Bacon*, 212 B.R. 66, 74 (Bankr. E.D.Pa.1997)).

The Bankruptcy Code defines "governmental unit" as "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States ..., a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government[.]" 11 U.S.C. § 101(27).

The legislative history of § 101(27) indicates that "governmental unit" is defined in the broadest sense.... "Department, agency, or instrumentality" does not include an entity that owes its existence to State action, such as the granting of a charter or a license but that has no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

S.Rep. No. 95–989, at 24 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810; *see also* H. Rep. No. 95–595, at 311 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6268.

New Baltimore Place is a privately owned apartment complex that participates in a subsidized housing program regulated by the federal government. The few cases that have addressed this issue have held that such an arrangement does not transform the private entity into a governmental unit. *See Stoltz v. Brattleboro Housing Authority (In re Stoltz)*, 315 F.3d 80, 90 n. 5 (2d Cir.2002) ("Section 8 leases ... arguably do not fall within the protection of section 525(a) because they are government-subsidized leases for privately owned housing units between a qualifying tenant and a private landlord."); *In re Liggins*, 145 B.R. 227, 232 (Bankr. E.D.Va.1992) ("Section 101(27) ... does not include language suggesting the inclusion of private entities ... which merely receive public funds and are subject to governmental regulations. The legislative history of Section 101(27) supports this conclusion because, although it states that the phrase is defined 'in the broadest sense,' the entity in question must be 'actually carrying out some governmental function.' H.R.Rep. No. 95–595, 95th Cong., 1st Sess., at 311 (1977), U.S.Code Cong. & Admin. News pp. 5787, 6268. This history thus indicates the entity must do more than merely receive government funds."(footnote omitted)); *In re Rosemond*, 105 B.R. 8, 9 (Bankr.W.D.Pa.1989) ("Section 525 has no application to private persons or entities except in the employment context."); *Spruce Ltd. P'ship v. Lutz (In re Lutz)*, 82 B.R. 699, 702 (Bankr. M.D.Pa.1988) ("This court is unaware of any cases, however, in which the term 'governmental unit' was held to apply to private entities which merely receive pub-lic funds and are subject to governmental regulations.").

The issue was addressed more recently in *In re Marcano*, 288 B.R. 324 (Bankr. S.D.N.Y.2003). There, the court consolidated, for purposes of its opinion, a pair of cases with similar issues. Both individual debtors argued that their separate landlords were "governmental units," and thus the landlords' eviction attempts based on failure to pay pre-petition dischargeable rent were in violation of § 525(a).

The Marcanos were an elderly couple receiving social security and renting a residence in a building owned by the city. Under a city-sponsored renewal program, the building's residents had formed a private tenants' association (TA) to lease the building from the city, and to take on the responsibility for its maintenance and management. Thus, the TA acted as landlord for the property. Pursuant to the city's renewal program, the TA had the option of purchasing the building from the city, but had not done so.

The TA attempted to evict the Marcanos for failure to pay rent. Mr. Marcano filed a petition for relief under chapter 7. Marcano argued that the TA was a governmental unit by virtue of the city's "control and influence" over the TA under the city's renewal program, and thus, his eviction for nonpayment of pre-petition dischargeable rent was improper under § 525(a) of the Code.

The *Marcano* court, citing *Brentwood Academy v. Tennessee Secondary School Athletic Assoc.*, 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001),[1] characterized Marcano's argument as falling under the

---

1. In *Brentwood,* the Supreme Court attempted to clarify the analytical framework for deciding "state action" questions. The Court noted that "state action" has been traditionally found under three scenarios: first, when the actor is beholden to the "coercive power" of the state; second, when the actor has been tasked with a "public function" of the state; and third, when the actor is "entwined with governmental policies ... management or control." *Id.* at 296.

concept of "entwinement." *Marcano* at 334. The court noted that although the TA was ostensibly a private entity, the city's renewal program provided a highly regulated framework for the TA's activities. *Id.* at 334–35. These activities were intricately supervised by the city or a city agency at several levels, including the setting of rents, access to tenant bank accounts, rights of physical access and an approval requirement for any sale of the property. *Id.*

Moreover, the *Marcano* court noted that other courts had found that private tenant associations organized under the city's renewal program were subject to constitutional restraints as "state actors," entitling tenants to due-process protections in the non-bankruptcy context. *Id.* at 335. The *Marcano* court found that "[u]nder these cases, where the state is so clearly 'entwined' with the tenant association that the tenant has a right to due process before being evicted, it would be anomalous to conclude that the TA is not a 'governmental unit' for purposes of the anti-discrimination provisions of § 525(a)." *Id.*

Oksentowicz argues that New Baltimore Place is performing a traditional and important governmental function of providing subsidized low income housing to senior citizens while under the direct control of HUD. Oksentowicz cites the following factors as evidence of New Baltimore Place's "entwinement" with governmental policies, management or control: 1) New Baltimore Place is required to provide low-income senior housing for the entire term of its 29 year, 9 month contract, signed in 1979; 2) New Baltimore Place is required to determine eligibility of applicants and rent charged according to guidelines set forth by HUD (See HUD Occupancy Handbook, Chapter 3, § 1, ¶ 3–6 and Chapter 5, § 1, ¶ 5–6); 3) HUD controls the nature of the services provided in the rent, what utilities

are included, and what equipment is to be provided in the apartments (See Ex. C to Housing Assistance Payment Contract); 4) HUD sets forth the grounds for eviction and the procedures to be taken for eviction (See Handbook, Chapter 8, § 3); 5) HUD can take over and continue the business of New Baltimore Place if it defaults on the contract (See Rider to Housing Assistance Payment Contract at ¶ 4(c)(1), (2)); and 6) the government, through its HUD website, advertises New Baltimore Place for government subsidized housing.

Additionally, HUD requires property owners to participate in an Affirmative Fair Housing Marketing Plan (See Ex. D. to Housing Assistance Payment Contract). HUD requires property owners to develop and make public written tenant selection policies and procedures that include descriptions of the eligibility requirements and income limits for admission. (See Handbook at Chapter 4, § 1, ¶ 4–4(A)). HUD mandates that the Tenant Selection Plans contain screening criteria that include standards prohibiting admission of those who have engaged in drug-related or criminal activity. (See Handbook, Chapter 4, § 1, ¶ 4–7(C)). HUD sets forth the procedures for rejecting a tenant application. (See Handbook, Chapter 4, § 1, ¶ 4–9). HUD requires property owners to use leases that are in a form acceptable to HUD. (See Handbook, Chapter 6, § 1, ¶ 6–5(A)).

The Court concludes that these factors establish significant entwinement with governmental policies, management and control, similar to that found in *Marcano*. New Baltimore Place cites certain functions as evidence of its independent authority to perform most functions related to its Section 8 units—screening applicants for credit worthiness, determining whether a security deposit is required, determining whether a tenant may make alterations to

the unit, determining whether a tenant may have pets, determining who may reside in the unit, setting house rules, maintaining the apartments, collecting rent, and evicting tenants. However, these controls are minimal compared to the controls HUD exerts over the property owners. Further, HUD determines what the property owners can and cannot control and those functions left to the property owners' discretion cannot conflict with any of the HUD regulations. For example, although the property owner is permitted to reject an applicant for a poor credit history, it may not reject an applicant for lack of a credit history. (See Handbook, Chapter 4, § 4, ¶ 4–27(B)). Further, although the property owner can determine whether a security deposit is required, the amount of the security deposit is determined by HUD. (See Handbook, Chapter 6, § 2, ¶ 6–15(E)). Although property owners can establish house rules, they must: "a. Be related to the safety, care, and cleanliness of the building or the safety and comfort of the tenants; b. Be compliant with HUD requirements; c. Not circumvent HUD requirements; d. Not discriminate against individuals based upon membership in protected class; e. Be reasonable." (See Handbook, Chapter 6, § 1, ¶ 6–9). The HUD Occupancy Handbook is replete with examples of HUD's control over property owners.

The cases cited above which concluded that entities which "merely receive public funds and are subject to governmental regulations" do not qualify as governmental units did not adequately analyze the government's involvement. Nor did they consider that the entity was carrying out a governmental function—providing low income housing.

Accordingly, the Court concludes that New Baltimore Place is a governmental unit subject to § 525(a).

### III.

■ New Baltimore Place also argues that Oksentowicz's application was not rejected solely because he filed bankruptcy. New Baltimore Place contends that it employs RentGrow to screen all applicants and that several factors were considered in denying Oksentowicz's application. (See NBPAA's Ex B, C, and D.) However, the only negative entries on Oksentowicz's credit report are his bankruptcy filing and his debts that he failed to pay which were discharged in bankruptcy. Section 525(a) specifically prohibits a governmental unit from discriminating against the debtor because he "has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act." 11 U.S.C. § 525(a).

Accordingly, the Court concludes that New Baltimore Place's rejection of Oksentowicz's housing application violated § 525(a). The Court will order New Baltimore Place to accept Oksentowicz's housing application.

Oksentowicz also seeks compensatory damages of $5,000, punitive damages of $15,000 and sanctions of $15,000. However, the factual basis for these requests is neither alleged nor proven, and these requests are therefore denied.

Finally, the debtor seeks attorney fees. The Court concludes that in this case the debtor should be awarded this relief. Accordingly, the debtor's attorney shall have 14 days within which to file and serve a statement of his fees, and New Baltimore Place shall have 14 days after service to file and serve a response.